Good morning. My name is Elisa Kaufman. I represent the petitioner Magda Fessahai Teclezghi. I'd like to reserve approximately three minutes. Just watch the clock. You may do so. I'll do my best. So, Ms. Teclezghi is a native and citizen of Eritrea. She and her family are Jehovah's Witnesses. Her family suffered persecution in Eritrea because of their faith. One of her brothers came to the United States and was granted asylum here in connection with his religion. She had an asylum application before the asylum office, and they found her not credible and referred her to the immigration judge. This leads us to the due process problems that we've come to today and that occurred at that hearing. Specifically, the immigration judge so allowed himself to be prejudiced by the testimony of the asylum officer who testified first before the case in chief that he wasn't able to provide the normal due process a petitioner would receive at an asylum hearing before an immigration court. Specifically, he relied so heavily on the asylum officer's testimony that he did not allow the petitioner to have a complete hearing, and he precluded one of her witnesses from testifying. What would that witness have contributed? That witness would have corroborated that Ms. Teclezghi was indeed a Jehovah's Witness. He was her brother. His asylum application, which was approved, was before the court. It's Exhibit 11, and he would have bolstered her credibility in that respect. In fact, the immigration judge's decision complains that she doesn't have any corroboration, but he himself prevented her from presenting it. Moving back to the due process issue, it's clear from Singh v. Gonzales that any petitioner before the immigration court is entitled to a de novo hearing. That didn't happen in this case. In this case, the immigration judge substituted the factual findings and legal conclusions of the asylum officer for his own and kept the hearing to about an hour, which is approximately the same amount of time he gave to the asylum officer. Lopez-Umansor is very instructive in this case as to, and I think you were interested in this in the previous case before me, the value of expert testimony. Are you making kind of a bias argument? I'm not quite sure I understand your argument. My argument is that by allowing a government witness who is to testify first, before the petitioner could put on her case in chief, the immigration judge allowed himself to be so prejudiced. Now, is that a violation of due process? Yes, it is, actually, because And is there a case that holds that the sequencing allowed by the IJ is a violation of due process? No, Your Honor, and if there was no evidence later of prejudice, then this probably wouldn't have been a problem. Normally, I believe in all court proceedings, immigration as well as civil and criminal, the individual who bears the burden of proof gets to put on their case in chief. And as my colleague basically concedes in her brief, the asylum officer's testimony or any expert testimony which is supposed to be used for impeachment comes after the testimony is introduced. It wasn't expert testimony, was it? It was just factual testimony. Well, you know, in this case, it was actually a bit of both. She was factually testifying about what Ms. Teclesi said at the interview, but she also offered in the form of an expert opinion what a Jehovah's Witness would and wouldn't know, and the judge relied upon that heavily in his decision. How do we know that? Oh, because he actually says that he begins on, I think it's page 42 of his decision, the testimony was clear and was supported by the exhibits, and he refers to the asylum officer's exhibits. Then he goes on to say the explanation, which is what Ms. Teclesi's testimony, how he viewed it, was, and he specifically cites as a Jehovah's Witness she should have known this and she should have known that. She testified by telephone, didn't she? The asylum officer did, yes. She was subject to cross-examination, was she not? She was, yes, but those safeguards, and normally if she was testifying for impeachment only, those safeguards would be appropriate, but. Well, now, apart from the sequence, your client was able to put on his case, was he not? Not completely, no. She was not. The judge made very clear that after one hour he was not going to entertain testimony. He was not what? He was not going to entertain testimony. He instructed Petitioner's Counsel not to take too long and only let her ask a few questions after the one-hour mark, and although at the beginning of the hearing he had acknowledged that there was this corroborative witness there, that witness wasn't allowed to testify because the time was up. There's other evidence to show, too, that he was prejudiced by having this person, the asylum officer, testify first. If you look at her testimony, the trial attorney only asked her foundational questions to lay the groundwork for her notes and her assessment. The judge asked her twice as many questions as the trial attorney, and although there were some questions on cross-exam about the same number as the trial attorney, it was clear that the judge was relying very heavily on this asylum officer. If you look then at the testimony by the petitioner, some of it relates to her religion, but in the judge's decision, he doesn't acknowledge any of that. He relies on what the asylum officer says. He refers to one question that he asked of the petitioner concerning the word temple. Didn't pursue her. She told him, I don't really understand you. I don't understand this word. He didn't pursue it. Instead, he considered this more evidence that she wasn't a Jehovah's Witness. And the only evidence in the record as to what a Jehovah's Witness would or wouldn't know was the testimony of the asylum officer, who was in that sense testifying as an expert. Is it your theory that if in fact she is or was a Jehovah's Witness, then she would have been entitled to asylum? Absolutely. Because per se, all Jehovah's Witnesses are automatically subject to abuse by the government of Eritrea? The exhibits do show that, Your Honor. The government, the report, the State Department report? Yes, the State Department report, Amnesty International. So it depends on her proving that she's really a Jehovah's Witness. Well, actually, Your Honor, it does, but it also requires her proving only that the Eritrean government perceived her as a Jehovah's Witness. She was a member of a family of Jehovah's Witnesses. That fact was never contested. And they sent her a letter instructing her to register for military service because in Eritrea both men and women serve in combat. And that also wasn't controverted, that the Eritrean government wanted her to serve. What was her response to the notice from the government? Well, by then she had already fled the country because one of her brothers had been imprisoned for six months. Two of them disappeared when they fled to Eritrea. They don't serve as Jehovah's Witnesses or conscientious objectors automatically. Exactly. And she did testify to that as well as other aspects of being a Jehovah's Witness. The immigration judge said if she is a Jehovah's Witness, she's not a very active one, which goes into a whole dangerous territory of whether we consider someone active or not a true member of their faith. Counsel, you're down to a minute and a half. You indicated you wanted to reserve some time. Yes, thank you. I do so. We'll hear from the government. Good morning, Your Honors. May it please the Court. My name is Shigeru Tadros on behalf of the United States. The petitioner in this case has failed to show compelling evidence that she is deserving of asylum, withholding, or CAT. She, even in the argument this morning, none of her credibility issues have been addressed. And just to off the bat address the due process issues that counsel was speaking to, with regard to the denial of a witness being able to testify, petitioner's brother, at the outset of the hearing on that day, counsel for petitioner said, we will have another witness here to testify on behalf of petitioner, her brother. And the immigration said that that was fine. And at the very end of the hearing, it is page 149 of the record, the immigration says, he's addressing petitioner's counsel, any redirect or case submitted, Ms. Alvarez, case submitted, Your Honor. She makes no attempt to call another witness. There's no evidence in the record that the judge didn't, restricted the time or didn't allow a witness to testify. With regard to the IJ being biased with, from the evaluation of the asylum officer, the asylum officer, usually if someone does an affirmative application for asylum, they go before an asylum officer first. And that is exactly what happened here. The asylum officer, the asylum officer's interview is part and parcel of the agency determination. Petitioner here has had three opportunities to present her claim to the agency, and she has failed to show compelling evidence that she, that the record compels that she is deserving of asylum. The petitioner's argument that the asylum officer set him up, set himself up as a sort of an expert on the, the teachings of Jehovah's Witnesses. Well. And then she fell short in answering his technical questions. Asylum officers, Your Honor, are schooled in certain, I mean they have to be, because they are looking for evidence of refugees, people fleeing persecution. And so there are many asylum officers that have professional training in certain areas. This asylum officer testified that she had interviewed well over 20 Jehovah's Witnesses. And it is, it is absolutely reasonable for the immigration judge to rely on her testimony. Plus, in this case, the petitioner was given the opportunity to cross-examine the asylum officer. There is not, in terms of the judge's bias, the judge, he heavily examined the asylum officer. But he also used her, he even says in his opinion, I wouldn't have used the petitioner, the opportunity to explain the things she didn't know, the things she didn't understand. Interestingly, when he gives the petitioner the opportunity, she doesn't say, for instance, the asylum officer had asked her to quote her favorite passage from the Bible. She evidently could not quote, like sort of gave an amorphous kind of answer and couldn't quote her favorite passage. She was asked to quote John 316. She didn't have any idea what John 316 was about. She was asked to quote some biblical, if she knew any biblical passages referring to lying, what the Bible says about lying. And she quoted two random passages that had nothing to do with lying at all. And her explanation was that she was nervous, which is absolutely understandable. I'm nervous standing here. But her explanation was that she transposed the numbers of the biblical passages. Well, even in transposing those numbers, if you look at those biblical passages with the numbers transposed, they have nothing to do with lying at all. They're random numbers that she just chose to give out. And instead of even saying, Your Honor, I was very nervous and I didn't, I didn't know the passages. I couldn't pull them out because I was so nervous. Instead, she gave another excuse that was not truthful, even to the, even before the immigration judge, instead of just admitting how nervous she was. With regard to prejudice, because the immigration judge gave her the opportunity to explain herself and because he asked her separate questions with regard to being a Jehovah's Witness, there's no prejudice here. She can't show prejudice. The immigration judge asked her, again, even if she talked it up to nervousness, she couldn't name any of the temples she had attended here in San Francisco. She couldn't name any people that she knew that attended. She said many people attend. She, with regard to other evidence, she didn't proffer any evidence, even if she wasn't, you know, she testified that she couldn't go often to her church because she worked. But she still could have gotten evidence from the minister there or the priest or other people just to say that she was a member and that she attended when she could. She had ample notice that the referral that comes from the asylum officer in that first stage, it tells her that she's being denied asylum, it's being referred to an immigration judge. There was no evidence that she was a Jehovah's Witness. The judge conducts a de novo hearing. So at that hearing, she could have presented, if you get a document that says to you there's an ample evidence, you're not credible that you're a Jehovah's Witness, and you are lucky enough to get a de novo hearing before an immigration judge after that, it seems to me that you would gather as much evidence as possible from every imaginable source. And the immigration judge wasn't even expecting things from Eritrea. He was expecting things here in the United States where she had been living. The record refers to some translation. Everything before the asylum officer went through a translator, apparently. Yes. What language is her language? I believe, just one second. Well, what I'm getting at is the Hebrew Bible or the... Western version of the Greek and Hebrew Bible translated into her language. When she was responding to these religious questions, was she aware of the somewhat arcane meaning of some of the terms in these writings? I believe the only term that she said she didn't understand was the word psalm. Psalm? Psalm. As in the book of Psalms. The Hebrew word for psalm. Yes, exactly. She was asked by the immigration judge if she asked her interpreter for the translation because she did testify that the asylum officer heard her speaking in English and wanted her to answer in English. But she said she didn't understand the word psalm. The immigration says, did you ask your interpreter for a translation? And she said, yes, I did, and he did translate. However, I didn't understand the word. So even in her own language, she didn't know the word for psalm. Are there additional questions, Your Honors? No further questions, Counsel. Just to sum up, Your Honors, there's no compelling evidence in the record that Petitioner established her eligibility for asylum withholding or removal. Thank you. Thank you, Counsel. Ms. Hoffman, you have reserved a little time. Okay. I didn't discuss the credibility issues previously because I really feel that this was a due process case because there was no de novo hearing. There was almost no independent credibility evaluation. A person doesn't get lucky to have a de novo hearing. Cindy Gonzalez and EOIR's own procedures prescribe a de novo hearing. So that was the first thing I wanted to point out. But I think the point Counsel seems to be making is you had the second chance and you weren't able to gather this corroborative information. Well, she did have her brother there. And contrary to what Counsel said, there is evidence in the record that the immigration judge limited the time. Her attorney says at the administrative record 135, 136, and 120, all of those points show that the judge was rushing her. And he told her attorney, don't take too long. I mean, that part was very clear. Why didn't the attorney say that's it or whatever? A lot of it is off the record. There's a lot of – if you look at the administrative record, they go on and off the record all the time. And it's unfortunate that we don't have in the record specifically the immigration judge saying, I'm only giving you one hour. But this frequently happens. In addition, back to the idea of an asylum officer being an expert, I actually have an advantage here. Excuse me. I am a former asylum officer. And I know that I interviewed hundreds, for example, of Sikhs. But I don't call myself an expert in the Sikh religion. And you can interview 20 Jehovah's Witnesses, but we still don't know from the record whether or not she believed any of them. Thank you, Counsel. Your time has expired. Oh, all right. The case just argued will be submitted for decision.
judges: Goodwin, Hug, O'Scannlain